Mr. Justice Van Orsdel
delivered the opinion of the Court:
This is an appeal from the decision of the Commissioner of Patents in an interference proceeding involving an invention for making paving brick. The brick is made with two ribs extending lengthwise on one side. These ribs have notches or *333 depressions at given intervals to the depth of the surface of the brick. ' The depressions are made by the device in issue, which consists of a ribbed wheel roller so adjusted to the machine that it will roll over the brick as it passes from the machine. The counts of the issue are as follows:
“1. In a brick machine, means for forming a bar of plastic material with parallel ridges upon one side at a distance apart, a ribbed wheel journaled with its axis above and at right angles to the movement of said bar, and its ribs adapted to engage with and indent said ridges even with the top of the bar, and means for severing the bar into lengths transversely of said ridges.
“2. In a brick machine, means for forming a rectangular block of plastic material having a plurality of longitudinal ridges upon one side, and means for forming each of said ridges into a plurality of projections subsequent to the formation of the ridges.”
The sole question presented is one of fact. The appellants, James Howard Chambers and Howard R. King, are officially connected with the Chambers Brothers Company, of Philadelphia, Pennsylvania, a firm ‘ engaged in manufacturing brick machines. Appellee, Charles H. Prost, is president of the Los Angeles Pressed Brick Company, of Los Angeles, California. Correspondence looking to the purchase of one of appellants’ machines by the Los Angeles Company resulted in the Chambers Company sending a salesman by the name of Boot to Los Angeles. Boot arrived there about March 24, 1907.
A brief review of the evidence relating to what occurred between Boot and those connected with the Los Angeles Company will be sufficient to dispose of this interference. It appears that the Los Angeles Company wished to procure a machine that would make a brick with two ribs upon one side, each rib to have a number of depressions in it to allow the cement to flow to the bottom of the brick in laying it in the pavement. This controversy arises from the alleged discussions had at this time as to how a device for producing the depressions in the ribs of the brick could be made.
*334 Appellee testified that “in taking up the matter with.Mr. Eoot that morning, I told him that two ribs could be run on the brick, and made a pencil sketch of the die to produce that,, and then told him that a corrugated or cogged wheel would indent the beads on the face of the brick so as to allow the cement filler to pass to the bottom of the brick. I told him I did not know how this toothed wheel could be fastened to the machine; he said that would be up to their mechanical department.”
Eemick, another witness, testified that he introduced Eoot to appellee at the office of the company a few days prior to April 1, 1907. They discussed the kind of machine they wanted and the nature of the difficulties they had with the machine they then had in use ; that he, Eoot, and Larson, the superintendent of the company, went to Santa Monica, where their machine was in use, and that the matter of making the brick required was discussed by them on this trip. Upon their return to the office they were joined by appellee, and the four discussed the matter, going into details of the style of brick required and various devices.for doing the work. He testified that at this meeting appellee insisted that a scheme should be devised which would obviate the necessity of repressing the brick, and explained to Eoot the form of a die which would do this. Eoot said that the matter of mounting it upon the machine would have to be left to the Chambers Company.
Larson testified to going with Eoot and Eemick to Santa Monica, and that, while there, and on their return, they discussed the device for cutting the notches in the ribs. He states that they discussed the roller with which this was to be accomplished, and discussed different ways of making and operating the roller; that Eoot stated they would have no difficulty in putting on the roller to do what they wanted, but the mounting of it should be left to the Chambers Company.
Larson further states that appellee saw Eoot on the day they went to Santa Monica, because appellee was not feeling well,, and requested Eemick and witness to accompanying Eoot. He does not remember whether appellee said anything about the *335 ribbed roller while Root was there, but, after appellee left, Root and he talked about using this ribbed roller to make the indentations on the ribs of the brick, and that he was surprised when the machine arrived to find that it had a wire cutter attached instead of the roller.
It appears that about a year later, in March, 1908, Root again visited Los Angeles, and that appellee on this occasion had an interview with Root, at which his son, Howard Frost,, was present and heard the conversation. Appellee testifies that he recounted his conversation with Root of the previous year,, his describing the shape of the die and corrugated wheel for-making the indentations in the ribs of the brick, and his discussion as to the fastening of it upon the machine, which was to be left to the mechanical department of the Chambers Company. He asked Root if he remembered that conversation, to-which Root replied that he did. This testimony of appellee is fully corroborated by the testimony of his son, Howard Frost.
Root secured an order from the Los Angeles Company for a brick machine. When the machine arrived, it contained a wire cutter for cutting out the depressions in the ribs of the-bricks. The machine was tested, and the cutter failed to give satisfaction. Appellee then constructed the device in issue,, which he contends he conceived and disclosed to Root about April 1, 1901, and mounted it upon the machine. It was tested and found to work successfully.
Appellants testified, and are corroborated, that, when the-order for the brick machine arrived at Philadelphia, they at once set about devising a machine for making the depressions in the ribs of the brick, and that, as a result, they made and tested a ribbed roller, which meets the device in issue, and the-wire device for clipping out sections of the clay from the ribs of the bricks. The latter device was the one put upon the machine shipped to the Los Angeles Company. It is unnecessary to consider or review the evidence as to what occurred in Philadelphia, since appellee must establish the date of conception *336 and disclosure at the time Root took the order at Los Angeles, or fail.
Root is the sole witness produced by appellant to contradict the testimony of appellee and his corroborating witnesses. Root goes so far as to deny that he even met appellee during his first trip to Los Angeles. Root’s letter transmitting the order does not appear in the record, but the correspondence between the two companies throws some light upon this case.
Appellee wrote a letter August 21, 1907, to the Chambers Company, in part as follows: “The brick machine arrived on the 28th of July, and is now running pretty smoothly after the usual experimenting and adjusting. We were not able to use your device for cutting the lugs on the brick, but have substituted something else which we think will be satisfactory.” It will be observed that appellee did not in this letter disclose the device substituted for the wire-cutting machine sent by the Chambers Company. An answer was sent to appellee under date of August 27th, in which they referred to the device for cutting indentations on the ribs of the bricks, as follows: “We have the device for cutting the lugs on the brick running here, and we thought it worked fairly well. We are interested to ask for what reason you could not use it, or what was the objection to it.” It will be observed that the Chambers Company made no reference to a ribbed roller as an alternative for the clipping device which had failed to give satisfaction.
A long series of correspondence followed regarding certain •changes on the machine to adapt it to handle the clay used, by the Los Angeles Company. The device in issue was not again referred to until January 80, 1908, when appellee wrote to the Chambers Company, in part, as follows: “When the machine came, the die for running out the ridges was just right, but the wire to cut pieces from the ridges was a failure, as the pieces cut out dropped all over the face of the brick, and when the bar was swelled it would cut into the brick, and at other times it would not cut out enough. We abandoned that at once and put on a ribbed wheel like a spur gear. This worked successfully and produced a uniform, perfect brick. * * * *337 I am sending you by express one of our paving blocks to show you how the projections stand up, and what a great improvement over a repressed brick. You will see how the cement filler can readily reach the bottom of the brick.” This was the first correspondence in which appellee stated to the Chambers Company the particular form of device which he had substituted for the wire cutter.
The Chambers Company replied to this letter under date of February 13, 1908, in substance, as follows: That Boot, in his order, described the sort of brick desired, but did not communicate any method for obtaining the result; that a few days after receiving the order they tested both the toothed wheel and the wire cutter method; that the brick made with the toothed wheel had four indentations in each rib, and are practically the same as the sample sent by appellee, closing the letter with the following statement: “While Mr. Boot sent to us your description of the brick that you wanted, we regard ourselves as the inventor of the mechanical devices for producing the result, and it was our intention to patent both devices if possible. The indenting cutter itself is already the subject of patents, and we have applications now in the office for further improvements upon the cutter. We, of course, don’t know just what your patent claims are, but under the circumstances cited above, our patent attorney advises us that the law would clearly entitle us to patent the two devices made by us for producing the brick referred to. At one' comer of this sheet we trace an outline of the toothed wheel used by us. We would like very much to hear from you further in this matter, and if convenient, have a copy of the claims allowed on your application.”
It will be observed that it was not until appellee had disclosed what he had substituted on the machine for the clipping device that the Chambers Company made any mention of the device in issue. Another significant fact is that they had applied for a patent for the clipping device, but had not for the ribbed wheel. It was not until appellee had disclosed what *338 he had substituted that they suggested their intention to apply for a patent for’ it.
All three of the tribunals of the Patent Office agree that the evidence produced by appellee sustains the alleged conception and disclosure to Root about April 1, 1907, but the Examiner of Interferences held it insufficient in point of law to sustain appellee’s right to priority. On this point the Examiner was reversed by the Examiners-in-Chief, whose decision was affirmed by the Commissioner. The Examiner of Interferences turned his decision upon the case of Marder v. Dey, 32 App. D. C. 593. It was held in that case that the conception of Marder was not sufficiently clear to convey an idea of means to constitute invention. The invention consisted in applying typewriter ribbons having two colors of ink to a machine known as a workman’s time recorder. It was held that though such ribbons were in common use on typewriters, the mere suggestion that such a ribbon might be applied to the device in issue was not sufficiently clear to suggest to one skilled in the art just how the application could be made.
In the present case the device is exceedingly simple, and, when suggested, its attachment to the machine in a manner to make it successfully operative could be accomplished by the application of mere mechanical skill. Whatever invention there is in the means for making the depressions in the manner described in the counts, consists in the suggestion of means for accomplishing the result, and not in attaching the device to the brick machine. This suggestion the evidence conclusively shows was made by appellee to appellant’s agent in Los Angeles about April 1, 1907, which entitles appellee to the award of priority.
The decision of the Commissioner of Patents is affirmed, and the clerk is directed to certify these proceedings as by law required. Affirmed.